UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                          :
LOUIS R. PAPPAS,
                                                          :
               Plaintiff,                                        OPINION & ORDER
                                                          :
        -against-                                                18 Civ. 576 (GWG)
                                                          :
ANDREW SAUL, Commissioner
of Social Security,                                       :

               Defendant.                                 :
-----------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Louis R. Pappas brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security (the "Commissioner")[1]

denying his claim for Disability Insurance Benefits under the Social Security Act (the "Act").

The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c), which Pappas has opposed.  For the reasons stated below, the Commissioner's

motion is granted.

I. BACKGROUND

        A. Procedural History

        Pappas filed an application for a period of disability and Disability Insurance Benefits

("DIB") on May 8, 2014, alleging a disability onset date of April 1, 2013.  See Certified

Administrative Record, filed July 2, 2018 (Docket # 12) ("R."), at 33, 162.[2]  The Social Security

---

[1]  Andrew Saul, who became Commissioner of Social Security on June 17, 2019, is
automatically substituted as defendant pursuant to Fed. R. Civ. P. 25(d).

[2]  The Commissioner subsequently filed a supplemental administrative record, which
consists of a page missing from the original administrative record.  See Supplemental Certified
Administrative record, filed Apr. 30, 2019 (Docket # 25).  Any reference to the missing page is
also by the citation to "R."

Administration ("SSA") denied Pappas's application on July 2, 2014. R. 33, 96. Pappas

requested a hearing before an administrative law judge ("ALJ") to review the denial. R. 102-07.

A hearing before an ALJ occurred on February 25, 2016, R. 58-65, and a second hearing before

the ALJ occurred on October 13, 2016, R. 68-86. In a written decision dated December 5, 2016,

the ALJ found Pappas was not disabled within the meaning of the Act. R. 33-49. Pappas

requested the Appeals Council review the ALJ's decision and that an extension of time be

granted in which to present a written argument and/or evidence. R. 159-61. The request for an

extension of time was granted, R. 25-26, and the Appeals Council acknowledged receipt of

additional medical evidence from Pappas, R. 5, see R. 8-16, but on January 8, 2018, the Appeals

Council denied Pappas's request for review of the ALJ's decision, R. 1-6. Pappas timely filed

this action pro se on January 22, 2018.

The Commissioner moved for judgment on the pleadings in July 2018, and the matter

was fully briefed as of November 2018.[3] However, on February 8, 2019, the Urban Justice

Center filed a notice of appearance as counsel for Pappas. Notice of Appearance, filed Feb. 8,

2019 (Docket # 20). Counsel also filed a letter requesting an amended briefing schedule and

leave to re-file Pappas's cross-motion and accompanying memorandum. Letter from Ann P.

Biddle, filed Feb. 8, 2019 (Docket # 21). Accordingly, the Court issued an Order: (1) deeming

Pappas's previous filings to be withdrawn; and (2) ordering a new briefing schedule. Order,

---

[3] See Commissioner's Notice of Motion, filed July 2, 2018 (Docket # 11); Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings, filed July 2, 2018 (Docket # 13) ("Comm'r Mem."); Plaintiff's Notice of Cross-Motion, filed Oct. 26, 2018 (Docket # 16); Memorandum of Law in Opposition of the Commissioner's Motion for Judgment on the Pleadings and in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, filed Oct. 26, 2018 (Docket # 17); Reply Memorandum of Law in Further Support of the Commissioner's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings, filed Nov. 16, 2018 (Docket # 18).

filed Feb. 8, 2019 (Docket # 22) ("February 8 Order").

Pappas filed his new cross-motion and memorandum, see Notice of Cross Motion for Remand for Further Proceedings, filed Apr. 8, 2019 (Docket # 23); Memorandum of Law in Support of Plaintiff's Cross Motion for Remand for Further Proceedings, filed Apr. 8, 2019 (Docket # 24) ("Pl. Mem."), and the Commissioner filed a reply, see Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings and in Further Support of the Commissioner's Motion for Judgment on the Pleadings, filed Apr. 30, 2019 (Docket # 26).

B. The Hearing Testimony

At his first hearing on February 25, 2016, Pappas chose to adjourn the proceeding so that he could attempt to obtain an attorney. R. 58-63.

At the second hearing on October 13, 2016, Pappas appeared again without an attorney, and the ALJ proceeded with the hearing despite Pappas's request to postpone. R. 68-70. Pappas testified that he was 50 years old, lived with his mother, and last worked a few years previously as an "indoor messenger," a position he held for 26 years. R. 71-72. The job involved delivering items ("small packages") between two office floors at a company in New Jersey. R. 72-73. Asked whether he could perform this job now in light of his health condition, Pappas replied that he would "[p]robably have a slight difficulty." R. 73. Pappas also testified to the rest of his daily activities. Pappas stated that while he can take the stairs in order to get to the subway platform and that he can ride the subway by himself, he always sits for the duration of his ride. R. 75-76. Additionally, Pappas stated: "I don't usually walk upstairs too many times," and that when he climbs the stairs he is "[a] little out of breath." R. 76. Pappas does go grocery shopping, but only with his mother, and she is the one who pushes the grocery cart. R. 77-78. As for exercise, Pappas takes "small walk[s]" to Henry Hudson Park, which is two blocks from

his home.  R. 76-77.  He also walks in the park, usually for around a "half an hour."  R. 77.

Pappas was not able to answer questions from the ALJ about his capacity to lift certain weights.

R. 78.

The ALJ next questioned medical expert Dr. Dorothy Kunstadt, a board certified

cardiologist, who testified via telephone.  R. 79-82.[4]  Dr. Kunstadt testified that Pappas had a

"near catastrophic event" in 2015, which was "dissection of his ascending aorta."  R. 80.

However, the problem was "diagnosed promptly and surgically treated," and although he had

resulting "complications," Pappas's "blood pressure came under control" and was since under

"excellent control."  R. 80.  Accordingly, Dr. Kunstadt testified that Pappas would be "capable to

do physical work but with restrictions," despite "some [supposed] deformity . . . of his spine."

R. 80.  The ALJ asked Dr. Kunstadt whether there was "anything in the record objectively that

would limit [Pappas's] ability to do [light work]."  R. 80-81; see 20 C.F.R. § 404.1567(b).  In

answering "no," Dr. Kunstadt noted that there would be some restrictions on Pappas's ability to

perform light work — that he could not lift 20 pounds frequently, and could not crouch or bend

frequently, though he could do these things "occasionally."  R. 81-82.  Except to the extent Dr.

Kunstadt briefly opened her remarks by mentioning that Pappas had been diagnosed with autism

as a young man, there was no discussion between the ALJ and Dr. Kunstadt with respect to

Pappas's alleged mental impairments.  In fact, Dr. Kunstadt acknowledged: "That's not my

domain."  R. 79.

Finally, the ALJ questioned the vocational expert ("VE"), who also testified via

telephone.  R. 83.  In response to the ALJ's questioning, the VE stated that Pappas's past

relevant work of "indoor messenger" had a Dictionary of Occupational Titles ("DOT") code of

---

[4]  Testimony before an ALJ by telephone is authorized by 20 C.F.R. § 404.936(c)(2).

230.663-010, a "light strength," and a "specific vocational preparation" level of two. R. 84.[5]

The ALJ then posed the following question to the VE: "Hypothetical person of the claimant's educational, vocational background who is limited to simple task instruction jobs, and can do light work, the full range of light work with at the most occasional stooping, bending, crouching. Could . . . he do this job?" R. 84. The VE responded that such an individual could do the indoor messenger job — her opinion being based on her "own professional experience." R. 84-85.

After the ALJ briefly summarized the VE's answer for Pappas's benefit, Pappas stated that he did not have any questions for the VE. R. 85.

C. The Medical Evidence

The Commissioner and Pappas have both provided summaries of the medical evidence in the record. See Comm'r Mem. at 2-13; Pl. Mem. at 5-11. The summaries are substantially consistent with each other. In any event, the Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see February 8 Order ¶ 3, and neither party has done so. Accordingly, the Court adopts both parties' summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit. We discuss the medical evidence pertinent to the adjudication of this case below.

D. The ALJ's Decision

The ALJ denied Pappas's DIB application on December 5, 2016. R. 49. First, the ALJ

---

[5] The VE stated that "indoor messenger" corresponded to DOT code 230.663-010. R. 84. However, that code corresponds to "DELIVERER, OUTSIDE," DOT, 230.663-010 (G.P.O.), 1991 WL 672160 (4th ed. 1991), which involves delivering items outside, an activity in which Pappas never engaged. However, DOT code 239.567-010, which corresponds to "OFFICE HELPER," DOT, 239.567-010 (G.P.O.), 1991 WL 672232 (4th ed. 1991), involves distributing mail and other items within an office building or other setting. Each occupation requires "light work," which is the type of work the ALJ ultimately found that Pappas could perform.

found that Pappas met the insured status requirements of the SSA though September 30, 2018.

R. 35. Then, following the five-step test set forth in SSA regulations, the ALJ found at step one

that Pappas had not engaged in "substantial gainful activity" during the time between his alleged

disability onset date — April 1, 2013 — and the present (the "relevant period"). R. 35. At step

two, the ALJ found that during the relevant period, Pappas suffered from "severe impairments"

of "spinal disorder, cardiovascular disorder (history of dissecting aneurysm of the

thoracoabdominal aorta status post aortic dissection repair and right lower extremity fasciotomy

with vascular surgery, history of congestive heart failure), hypertension and organic mental

disorder." R. 35-36.

At step three, the ALJ found that none of Pappas's severe impairments, singly or in

combination, met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (the "listings"). R. 36-38. In reaching this conclusion, the ALJ gave particular

attention to listings 1.00 (Musculoskeletal System), 4.00 (Cardiovascular System) and 12.00

(Mental Disorders). R. 36-38. The ALJ specifically analyzed whether the "paragraph B" criteria

of the listings were met as to Pappas's organic mental disorder under listing 12.02.[6] R. 36-38;

see 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.02. To meet those criteria, a claimant must

show that their mental impairment(s) result in "at least two of the following: marked restriction

---

[6] At the time of Pappas's hearing and the date the ALJ rendered his decision, an older
version of the rules regarding the evaluation of medical evidence were in effect. See Revised
Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,138, 2016 WL
5341732 (Sept. 26, 2016). The old regulations gave different titles to the "paragraph B" criteria
under listing 12.02. See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.02 (Sept. 26, 2016).
The new regulations went into effect on January 17, 2017, and apply to "claims that [were]
pending on or after the effective date." Revised Medical Criteria, 2016 WL 5341732, at *66138.
The decision in Pappas's case was issued in December 2016, R. 49, and the Appeals Council
denied Pappas's request for review in January 2018, applying the "laws, regulations and rulings
in effect as of the date [of the ALJ's decision]," R. 1. Accordingly, the old rules apply.

of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." R. 36; see 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.02(B). "A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." R. 36; see 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(C)(4).

The ALJ concluded that Pappas's mental impairment resulted in a mild restriction on his activities of daily living, R. 36-37, moderate difficulties with respect to social functioning, R. 37, and moderate difficulties regarding concentration, persistence, or pace, R. 37-38. The ALJ also found that Pappas had not experienced any episodes of decomposition of an extended duration. R. 38. In reaching these conclusions, the ALJ considered Pappas's hearing testimony, psychological evaluations, and reports from state agency consultative examinations. R. 36-38. The ALJ further concluded that the medical evidence failed to establish the presence of "paragraph C" criteria, R. 38, which would have indicated a "[m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities," 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.02(C). Accordingly, the ALJ concluded that Pappas did not have an impairment that meets or medically equals one of the listings.

The ALJ next addressed Pappas's residual functional capacity ("RFC"). R. 38-48. The ALJ found that Pappas had the RFC to perform "light work," which "does not require more than occasional stooping, bending, crouching and kneeling, which does not require more than occasional contact with supervisors, coworkers and the public, and which is simple

task/instruction work." R. 38. Specifically, the ALJ found that Pappas can: 1) "understand and carry out instructions," 2) "maintain attention and concentration," 3) "interact appropriately with supervisors, coworkers and the public," and 4) "keep a regular schedule, all within normal work expectations." R. 38. In reaching these conclusion, the ALJ found that while Pappas described various limitations, the RFC determination was consistent with the record evidence and was supported by the October 2016 hearing testimony of Dr. Kunstadt, and the April 2016 findings of a consultative examiner "who performed psychological and psychiatric evaluations" on Pappas. R. 38. The ALJ also found that the record did not indicate any extensive treatment for back, spinal, or musculoskeletal pain, R. 39; did not indicate any evidence establishing the existence of a cardiovascular disorder, which would preclude performance of light work, R. 40-42; and contained evidence that Pappas's organic mental disorder would not greatly impact his ability to perform light work, R. 42-45.

With respect to opinion evidence, the ALJ noted that he assigned "little weight" to the opinions of consultative examiners, who evaluated Pappas in March 2014 and April 2016, that Pappas's physical and mental limitations would interfere with his ability to function on a daily basis, because their determinations were "unsupported by objective clinical findings and are inconsistent with the evidence of record." R. 46. The ALJ also gave "little weight" to the opinion of Nurse Practioner Joan Fitten that Pappas could only sit for four hours, stand for two hours, and walk for two hours during an eight-hour workday, because her opinion was "unsupported by objective clinical findings and . . . inconsistent with the evidence of record." R. 46. The ALJ noted that he assigned "significant weight" to the opinion of Dr. Kunstadt, the "duly qualified medical expert (cardiologist) who thoroughly reviewed the evidence of record and testified at the October 2016 hearing and to the opinion of the consultative examiner who

performed psychological and psychiatric evaluations in April 2016." R. 47. The ALJ assigned "some weight" to the opinions of the consultative examiners who performed examinations in March and June 2014, to the opinion of the consultative examiner who performed a psychiatric evaluation in March 2014, and to the opinions of a state agency psychologist and psychiatrist who performed evaluations in March and May 2014. R. 47-48.

Having determined Pappas's RFC, the ALJ evaluated at step four whether Pappas could continue his past work as an indoor messenger. R. 48. In doing so, the ALJ considered the testimony of the VE, who testified at the October 2016 hearing that "that the claimant's past relevant work as an indoor messenger involves a light level of physical exertion," and in response to the ALJ's hypothetical — "concerning an individual, who retains the functional capacity to perform light work, which does not require more than occasional stooping, bending, crouching and kneeling, which does not require more than occasional contact with supervisors, co-workers and the public, and which is simple task/instruction work" — determined that such a hypothetical individual could perform work as an indoor messenger. R. 48. Assigning the VE's testimony "substantial weight," the ALJ found that Pappas was able to perform his past relevant work as an indoor messenger. R. 48. Accordingly, the ALJ concluded that a finding of "not disabled" was appropriate, for Pappas had not been under a disability as defined in the SSA during the relevant period. R. 48-49; see Social Security Act §§ 216(I), 223(d).

## II. GOVERNING STANDARDS OF LAW

### A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

It is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012). Rather,

a court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). The "threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial

evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would <u>have to conclude otherwise</u>." <u>Id.</u> (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." <u>Johnson</u>, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

     B. <u>Standard Governing Evaluation of Disability Claims by the Agency</u>

     The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); <u>see</u> <u>id.</u> § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

     To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); <u>accord</u> <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); <u>Craig v. Comm'r of Soc. Sec.</u>, 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

     Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>see also</u> <u>Burgess</u>, 537 F.3d at 120 (describing the five-step process). First, the

Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

    C.  The "Treating Physician" Rule

    Under the so-called "treating physician" rule, in general, the ALJ must give "more

weight to medical opinions" from a claimant's "treating source" — as defined in the regulations — when determining if the claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[7]  Treating sources, which includes some professionals other than physicians, see 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The Second Circuit has summarized the deference that must be accorded the opinion of a  "treating source" as follows:

> Social Security Administration regulations, as well as our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion.  First, the ALJ must decide whether the opinion is entitled to controlling weight.  "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Burgess, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)).  Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it.  In doing so, it must "explicitly consider" the following, nonexclusive "Burgess factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  Selian[, 708 F.3d at 418] (citing Burgess, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))).  At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)). . . .  An ALJ's failure to "explicitly" apply the Burgess factors when assigning weight at step two is a procedural error.  Selian, 708 F.3d at 419-20.

Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019).  Accordingly, the Second Circuit has

---

[7]  Although the SSA has since revised its rules to eliminate the treating physician rule, because the claim here was filed before March 27, 2017, the rule applies in this case.  See, e.g., Conetta v. Berryhill, 365 F. Supp. 3d 383, 395 n.5 (S.D.N.Y. 2019).

stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; accord Estrella, 925 F.3d at 96; see also Greek, 802 F.3d at 375-77.

Nonetheless, the Commissioner is not required to give deference to a treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran, 362 F.3d at 32 (citation omitted). In fact, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citation omitted). Finally, a "slavish recitation of each and every [factor listed in 20 C.F.R. § 404.1527(c)]" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear," Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing Halloran, 362 F.3d at 31-32), and even where the ALJ fails to explicitly apply the "Burgess factors," a court may, after undertaking a "'searching review of the record,'" elect to affirm the decision if "'the substance of the treating physician rule was not traversed.'" Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32).

D. Credibility Determinations

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales,

402 U.S. at 399) (additional citations omitted).  Thus, the ALJ, "after weighing objective

medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to

discredit the claimant's subjective estimation of the degree of impairment."  Tejada v. Apfel, 167

F.3d 770, 775-76 (2d Cir. 1999) (summarizing the holding of and citing with approval

Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).  Nonetheless, when

discounting a claimant's credibility regarding his or her residual functional capacity, regulations

impose some burden on the ALJ to explain his or her decision.  As the Second Circuit has stated:

> When determining a claimant's RFC, the ALJ is required to take the claimant's
> reports of pain and other limitations into account, 20 C.F.R. § 416.929; see
> McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir.
> 1980), but is not required to accept the claimant's subjective complaints without
> question; he may exercise discretion in weighing the credibility of the claimant's
> testimony in light of the other evidence in the record.  Marcus v. Califano, 615
> F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49; see also 20 C.F.R. § 404.1529.  To evaluate a claimant's assertion of a

limitation, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a
> medically determinable impairment that could reasonably be expected to produce
> the symptoms alleged.  20 C.F.R. § 404.1529(b).  That requirement stems from
> the fact that subjective assertions of pain alone cannot ground a finding of
> disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an
> impairment, at the second step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as consistent with the objective
> medical evidence and other evidence" of record.  Id.  The ALJ must consider
> "[s]tatements [the claimant] or others make about [his] impairment(s), [his]
> restrictions, [his] daily activities, [his] efforts to work, or any other relevant
> statements [he] make[s] to medical sources during the course of examination or
> treatment, or to [the agency] during interviews, on applications, in letters, and in
> testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see
> also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier, 606 F.3d at 49 (alterations and emphasis in original).

The SSA has issued regulations relating to reports of pain or other symptoms affecting

the ability to work by a claimant for disability benefits.  20 C.F.R. § 404.1529(c).  These

regulations provide, inter alia, that the SSA "will not reject [a claimant's] statements about the

intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have

on [his] ability to work solely because the available objective medical evidence does not

substantiate [his] statements."  Id. § 404.1529(c)(2).  The regulations also provide that the SSA

"will consider whether there are any inconsistencies in the evidence and the extent to which

there are any conflicts between [a claimant's] statements and the rest of the evidence."  Id.

§ 404.1529(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding

"must . . . be set forth with sufficient specificity to permit intelligible plenary review of the

record."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing

Carroll, 705 F.2d at 643); accord Craig, 218 F. Supp. 3d at 263.  The ALJ must make this

determination "'in light of medical findings and other evidence[ ] regarding the true extent of the

pain alleged by the claimant.'"  Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (quoting

McLaughlin, 612 F.2d at 705).  However, where an ALJ gives specific reasons for finding the

claimant not credible, the ALJ's credibility determination "is generally entitled to deference on

appeal."  Selian, 708 F.3d at 420 (citing Calabrese v. Astrue, 358 F. App'x 274, 277 (2d Cir.

2009) (summary order)).  Thus, "[i]f the [Commissioner's] findings are supported by substantial

evidence, the court must uphold the ALJ's decision to discount a claimant's subjective

complaints."  Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir.

1984) (internal citations omitted); see also 42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive . . . .").

III.  <u>DISCUSSION</u>

     Pappas makes four arguments as to why remand is necessary: (1) the ALJ failed to consider Pappas's learning disability and areas of limited cognitive functioning at step two of the sequential analysis and in determining Pappas's RFC; Pl. Mem. at 17-19; (2) the ALJ improperly assessed the credibility of Pappas's statements concerning the severity of his symptoms, <u>id.</u> at 19; (3) the ALJ improperly weighed certain opinion evidence and failed to give good reasons for the weights assigned to various opinions, <u>id.</u> at 20-22; and (4) Pappas did not voluntary waive his right to counsel at his hearing with the ALJ and was prejudiced as a result, <u>id.</u> at 22-28.

     We discuss these issues next.

    A.  <u>Failure to Consider Areas of Limited Cognitive Functioning</u>

     Pappas first argues that the ALJ erred in (1) rejecting the limitations revealed by valid IQ testing, which revealed poor memory skills; and (2) "failing to consider [Pappas's] learning disorder to be a severe impairment and, in turn, to assess the relevant limitations when assessing RFC."  Pl. Mem. at 17; <u>see</u> <u>id.</u> at 9.

     1.  <u>IQ Testing</u>

     The ALJ considered Pappas's varying IQ scores — which ranged from 80 to 88, categorized as "low average range" — and cited them throughout his RFC discussion.  <u>See</u> R. 43-44.  The ALJ also determined that one of Pappas's serve impairments was an "organic mental disorder," R. 35, and although there were indications in the record that Pappas had once been characterized as having autism, R. 36 (citing, <u>e.g.</u>, R. 264, 296, 380), there were also records indicating that Pappas was never actually diagnosed with or evaluated for an autism disorder, <u>id.</u>; <u>see</u> R. 257 (2014 National Institute for People with Disabilities evaluation noting that "Louis has never been diagnosed or evaluated for Autism.").  Nevertheless, it appears the

ALJ took into account the "low average" IQ scores and Pappas's overall cognitive deficiencies, and ultimately limited Pappas to "simple task/instruction work."  R 38.

The ALJ also "rate[d] the degree of functional limitation resulting from the impairments" for each of the four functional areas regarding mental impairments and abilities, as he was required to do.  Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008) (internal punctuation and citation omitted).  In evaluating the "paragraph B" criteria, the ALJ first determined that Pappas had only mild restrictions with respect to activities of daily living.  In support of this finding, the ALJ discussed reports from a 2014 examination indicating that Pappas was able to shower, bathe, and groom himself, cook certain foods using a microwave, shop at the grocery store, and use public transportation.  R. 36-37 (citing R. 240, 259, 386, 393, 402).  The ALJ also cited April 2016 reports from consultative examiners, which established that despite some limitations, Pappas was "able to dress, bathe and groom himself, that he is able to do light cleaning, that he is able to make light meals/prepare simple foods using a microwave, that he shops for small items, and that he travels independently on public transportation."  R. 37 (citing R. 345, 349, 362).  Pappas himself explained at his October 2016 hearing that he used public transportation, took walks in the park, and shopped for groceries with his mother.  R. 37; see R. 75-78.

With respect to social functioning, the ALJ found that Pappas had only moderate difficulties.  Supporting this determination were notes from 2014 and 2016 examinations finding that Pappas reported spending time socializing with friends, R. 37 (citing R. 386, 393); see R. 261, 345, 349, and that he displayed "cooperative behavior, a fair manner of relating, social skills and overall presentation, and appropriate eye contact," R. 37 (citing R. 392); see R. 199 (with respect to social activities, describing that a "[f]riend visits him at home").  Other evidence suggested that Pappas has a friendly demeanor and that he has the ability to relate adequately to

others.  R. 37 (citing R. 343-45).  A May 2014 disability determination report found that Pappas only had moderate difficulties maintaining social functioning.  R. 37 (citing R. 91).

As to maintaining concentration, persistence, and pace, the ALJ found that Pappas had only moderate difficulties.  In support of that determination, the ALJ explained that consultative examiners noted that Pappas reads, draws, watches television, R. 37 (citing R. 386, 393); see R. 198; enjoys playing computer video games, R. 37 (citing R. 198); was "not distractible," and "was able to focus and sustain attention on all administered items during a psychological evaluation," R. 37 (citing R. 257); see R. 344.  Two state agency consultants and psychological consultative examiner Dr. Rupp-Goolnick found no significant limitations in Pappas's ability to understand, remember, carry of simple instructions, or interact with co-workers and the general public.  R. 92-93, 345, 349, 351-53, 356-58.  Indeed, Dr. Rupp-Goolnick found after an examination that there was "no evidence of limitation" in Pappas's ability to "[f]ollow and understand simple directions, and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, [and] perform complex tasks independently."  R. 349; see R. 401-02 (state agency expert Dr. Harding finding only "[m]oderate[]" limitations in Pappas's ability "to maintain attention and concentration for extended periods").  Further, although consultative examiner Dr. Damari opined that Pappas had certain limitations as to his abilities in cognitive functioning, R. 392-94, the ALJ could properly give little weight to that opinion because it was inconsistent with the record as a whole.  See, e.g., Perozzi v. Berryhill, 287 F. Supp. 3d 471, 492 (S.D.N.Y. 2018) (ALJ could properly conclude one physician's findings were inconsistent with those of other physicians, and it "was within the ALJ's discretion to resolve such conflicts between medical opinions in the manner he did") (citing Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (noting that an ALJ may "choose

between properly submitted medical opinions")). Even Dr. Damari found that Pappas could "follow and understand simple directions and instructions and perform simple tasks independently," and that he would "be able to maintain a regular schedule." R. 393.

As to episodes of decomposition, the ALJ correctly found that Pappas had not experienced any such episodes that were of an extended duration. R. 38.

Critically, Pappas does not explain how the low IQ scores showing memory limitations bear on any functional limitations. In any event, Pappas's memory score was characterized as being "within the low average range to upper borderline range of intellectual functioning." R. 344. Dr. Rupp-Goolnick also found that Pappas had "intact" recent and remote memory skills. R. 348. Indeed, any limitations on Pappas's memory function were not so severe as to prevent him from working successfully as an indoor messenger for 26 years. See R. 9, 72, 249, 256, 261, 343. The ALJ recognized that other testing showed impaired memory skills, see, e.g., R. 43, but based on the above, the ALJ could properly take into account Pappas's cognitive limitations including the IQ scores and limit him to "simple task/instruction work." R. 38.

Pappas cites Rivera v. Colvin, 2017 WL 1005766 (D. Conn. Mar. 15, 2017), in support of his argument that the ALJ improperly rejected the limitations indicated by the IQ scores. Pl. Mem. at 17-18. Rivera is distinguishable for several reasons, however. First, the IQ scores in Rivera were significantly lower than they are here, see Rivera, 2017 WL 1005766, at *2, and Pappas does not argue the low IQ scores prohibited him from performing basic work activities. Second, the ALJ in Rivera concluded that the IQ testing was "invalid" — thus, the court found that the ALJ had erred because the ALJ could not "discredit or assign weight to IQ testing as if it is a medical opinion because IQ testing is more adequately considered a 'laboratory finding.'" Id. at *6. There is no indication or suggestion from Pappas here that the ALJ discredited the IQ

testing as if it were a "medical opinion." Rather the ALJ clearly considered the IQ scores in making his overall disability assessment. See R. 43-44.

2. Learning Disorder

Under the Commissioner's regulations, an alleged impairment is "severe" only "if it significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996); 20 C.F.R. § 404.1520(c). Basic work activities include the following: "'walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations.'" Taylor v. Astrue, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (alterations in original) (quoting Gibbs v. Astrue, 2008 WL 2627714, at *16 (S.D.N.Y. July 2, 2008)) (additional citation omitted). "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment,' is not, by itself, sufficient to render a condition 'severe.'" Taylor, 32 F. Supp. 3d at 265 (quoting Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)).

Here, Pappas does not point to any evidence suggesting that any of his cognitive deficiencies "significantly limits [his] physical or mental abilities to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1. In fact, substantial evidence in the record indicates that Pappas's "learning disability" should not be included as one of his "severe" impairments. For instance, state agency psychiatric consultant Dr. G. Kleinerman concluded in 2014 that while Pappas's understanding and memory were limited, Pappas's ability to "remember locations and work-like procedures," and "understand and remember very short and simple instructions" was not significantly limited, and Pappas's "ability to understand and remember detailed

21

instructions" was only moderately limited.  R. 92.  Further, Dr. Kleinerman found that Pappas's abilities to "sustain an ordinary routine without special supervision" and "make simple work-related decisions" were also not significantly limited.  R. 93.  Psychological consultative examiner Dr. Rupp-Goolnick reported in 2016 that Pappas's verbal comprehension, working memory, perceptual reasoning, and proceeding speed test results were "all within the low average range to upper borderline range of intellectual functioning."  R. 344.  She noted that Pappas could prepare simple meals, do light housekeeping, the laundry, take public transportation, visit his friends, and that he enjoyed drawing, relaxing, watching television, and going on the internet.  R. 345.  Dr. Rupp-Goolnick also found that Pappas could do the following with "no evidence of limitation": "Follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress."  R. 345.  The results of Dr. Rupp-Goolnick's examination led her to rule out the existence of "any psychiatric or cognitive problems that would significantly interfere with the claimant's ability to function on a daily basis."  R. 345.  She also found Pappas's prognosis to be "[g]ood given no evidence of psychiatric or cognitive impairment."  R. 346.  A psychology evaluation from the National Institute for People with Disabilities noted that Pappas, despite scores in the "low" range on a variety of social functions examinations and intelligence tests, R. 257-59, could read and write, tell time on a digital clock, count, and use money independently, R. 262.

Pappas argues that the ALJ's alleged error in failing to consider the learning disorder to be a "severe" impairment, is "compounded by the ALJ's failure to properly weigh Dr. Damari's opinion, which either received 'little' weight or 'some' weight."  Pl. Mem. at 18.  He also

maintains that the ALJ's "lack of clarity" in assigning "little" and "some" weight to Dr.

Damari's opinions was legal error, and also that the ALJ's assigning greater weight to the "state

agency reviewer" was an "additional error." Id. Dr. Damari concluded that although Pappas

could "follow and understand simple directions and instructions and perform simple tasks

independently," and would "be able to maintain a regular schedule," R. 393, he was

"significantly impaired" in his ability to "maintain attention and concentration," "learn new tasks

and perform complex tasks independently," and that the medical evaluation results were

"consistent with cognitive problems" that "may significantly interfere" with Pappas's ability "to

function on a daily basis." R. 393-94. First, as we have already determined that the ALJ did not

err in failing to consider Pappas's learning disorder to be a "severe" impairment, the ALJ's

decision not to categorize impairment as such is not "compounded" by the ALJ's treatment of

Dr. Damari's opinions. Second, the ALJ did not err in any way in assigning differing weights to

the various opinions of Dr. Damari, because "[g]iving different weight to different parts of a

medical opinion is generally acceptable." Brush v. Berryhill, 294 F. Supp. 3d 241, 262

(S.D.N.Y. 2018) (citing Howe v. Colvin, 2013 WL 4534940, at *14 (S.D.N.Y. Aug. 27, 2013)).

Third, in arguing that the ALJ erred in according "greater weight" to a "state agency reviewer,"

Pl. Mem. at 18, we assume Pappas refers either to the ALJ according "significant weight" to the

opinions of consultative examiner Dr. Rupp-Goolnick, R. 349, and/or "some weight" to the

opinions of state agency consultants Drs. Kleinerman, R. 91, and Harding, R. 399, who together

found at most only "moderate" difficulty in concentration. The ALJ did not err simply by

according the opinions of these sources "greater weight." This is because "the Second Circuit

has made it clear that the opinions of State agency medical consultants[] . . . may constitute

substantial evidence" as long as those opinions are themselves supported by substantial

evidence.  <u>Monroe v. Comm'r of Soc. Sec.</u>, 2016 WL 7971330, at *8 (N.D.N.Y. Dec. 29, 2016)

(citing <u>Diaz v. Shalala</u>, 59 F.3d 307, 313 n. 5 (2d Cir. 1995)); <u>Colbert v. Comm'r of Soc. Sec.</u>,

313 F. Supp. 3d 562, 577 (S.D.N.Y. 2018) ("ALJ may give greater weight to a consultative

examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions

are more consistent with the underlying medical evidence") (citation and quotation marks

omitted).  Here, based on the record evidence as already discussed, the ALJ could properly

accord these opinions that Pappas had only "moderate" difficulties in maintaining concentration,

persistence, or pace "greater" weight.

     B.  <u>Failure to Evaluate Opinion Evidence</u>

 As to the opinion evidence of record, Pappas contends the ALJ: (1) erred in according

the opinions of psychiatric consultative examiner Dr. Damari both "some weight" and "little

weight," Pl. Mem. at 18; and (2) failed to articulate "good reasons" for assigning weight to

various medical opinions, <u>id.</u> at 20.

As noted, if the ALJ does not give controlling weight to a treating source's opinion, the

ALJ must provide "good reasons" for the weight given to that opinion.  <u>See</u> <u>Greek</u>, 802 F.3d at

375 (quoting <u>Burgess</u>, 537 F.3d at 129-30); <u>accord</u> <u>Messina v. Comm'r of Soc. Sec. Admin.</u>, 747

F. App'x 11, 15 (2d Cir. 2018) ("Under the treating physician rule, 'the ALJ is required either to

give the treating physician's opinions controlling weight or to provide good reasons for

discounting them.'") (quoting <u>Zabala v. Astrue</u>, 595 F.3d 402, 409 (2d Cir. 2010)) (bracketing

omitted); <u>see also</u> <u>Halloran</u>, 362 F.3d at 32.  However, the same rule requiring the ALJ provide

"good reasons" to a treating source's opinion does not apply to non-treating sources.  <u>See</u> <u>Sepa v.

Colvin</u>, 2016 WL 7442658, at *6 n.3 (S.D.N.Y. Dec. 27, 2016) ("the ALJ is not required to give

'good reasons' for discounting the opinion of a non-treating source"); <u>Fabian v. Colvin</u>, 2015

WL 792065, at *7 (N.D.N.Y. Feb. 25, 2015) ("There is no such requirement to provide good reasons for the weight afforded to a non-treating physician's opinion.") (citing cases). Nevertheless, "[t]he requirement to explain the evaluation of a physician's medical opinion applies to non-treating physicians as well." Santiago v. Comm'r of Soc. Sec., 2014 WL 3819304, at *19 (S.D.N.Y. Aug. 4, 2014) (citing 20 C.F.R. §§ 416.927(c), 416.927(e)(2)(ii)).

Here, the ALJ acknowledged Dr. Damari's March 2014 medical source statement that Pappas was "significantly impaired in [his] ability to maintain attention and concentration and that the results of the evaluation appear to be consistent with cognitive problems, which may at this time significantly interfere with [his] ability to function on a daily basis." R. 46 (citing R. 393-94). However, the ALJ found Dr. Damari's conclusion to be "unsupported by objective clinical findings and . . . inconsistent with the evidence of record" and thus gave the opinions "little weight." R. 46. This was because, as the ALJ explained, the evidence, including Dr. Damari's own records, showed that Pappas was able to engage in a wide range of daily activities including being able to shower, bathe, dress, watch television, play video games, read, socialize with friends, cook simple meals, shop in a grocery store, use public transportation, and draw. R. 46-47. Significantly, these observations were confirmed by a National Institute for People with Disabilities report completed that same year in November 2014, as well as an April 2016 consultative examination and Pappas's own October 2016 hearing testimony. R. 47; see R. 92-93, 198, 257, 345, 349, 356-58, 386, 393.

The ALJ later states that he also gave "some weight" to the opinions of Dr. Damari. R. 47 ("Furthermore, the undersigned accords some weight to the opinions of . . . the consultative examiner who performed a psychiatric evaluation in March 2014.") (record citation omitted). The ALJ, however, had just previously stated he was giving "little weight" to certain

of Dr. Damari's opinions. R. 46. Pappas contends that this "lack of clarity" — i.e., the ALJ stating that he accorded "little weight" to Dr. Damari's opinions and also "some weight" to those same opinions — is legal error. See Pl. Mem. at 18. While we agree that there is a lack of clarity, the ALJ's statements are best explained by the fact that it is acceptable for an ALJ to give "different weight to different parts of a medical opinion." Brush, 294 F. Supp. 3d at 262 (citing Howe, 2013 WL 4534940, at *14); see Koppers v. Colvin, 2016 WL 6888841, at *4 (W.D.N.Y. Nov. 23, 2016) ("It is well settled that, in resolving the evidence, the ALJ is entitled to accept parts of a doctor's opinion and to reject others.") (citing Veino, 312 F.3d at 588-89). Here, the ALJ was very specific about the "determinations" of Dr. Damari to which he was according "little weight." R. 46. The ALJ considered Dr. Damari's determination that Pappas's impaired abilities in maintaining attention and concentration (which were "consistent with cognitive problems") would "significantly interfere" with his ability to function on "a daily basis," and explained that he was giving little weight to that opinion because it was inconsistent with record evidence. R. 46 (citing R. 394). The ALJ's later statement that he was giving Dr. Damari's opinions "some weight" is reasonably understood as according weight to those aspects of the opinions to which the ALJ was not specifically characterizing as deserving of "little weight." The wording hardly matters, however, because the ALJ was quite specific as to those aspects of Dr. Damari's opinion to which he was according "little weight."

Pappas next argues that the "ALJ failed to give good reasons for the weight assigned to opinion evidence." Pl. Mem. at 20. He maintains the ALJ erred in assigning "some" weight to the opinions of two consultative internists who examined Pappas in 2014, and to the two state agency specialists who reviewed records available as of May 2014, "without explanation." Id. The ALJ also erred, according to Pappas, in assigning "significant weight" to the opinions of

consultative psychologist Dr. Rupp-Goolnick "without explanation," and in "steeply

discount[ing] opinions simply for being 'unsupported by objective clinical findings' and

'inconsistent with the evidence of record' without detailing more." Id. The opinions Pappas

contends the ALJ improperly "discounted" are contained in October 2014 and September 2016

reports from Montefiore Medical Center, R. 250-55, 376-79; Dr. Damari's March 2014

consultative examination report; R, 391-94; and Dr. Archbald's April 2016 consultative

examination report, R. 361-65.

Pappas's claim, Pl. Mem. at 15, 20, that the ALJ assigned weights to varying non-treating

sources "without explanation" or "without detailing more" is unfounded. The ALJ in fact

explained the opinions were "unsupported by objective clinical findings and are inconsistent

with the evidence of record, as elaborated on in the decision." R. 46 (emphasis added). The

ALJ's decision describes at length the ALJ's assessment of the record and opinion evidence. R.

39-47. And, of course, "[a]n ALJ need not recite every piece of evidence that contributed to the

decision, so long as the record 'permits us to glean the rationale of an ALJ's decision.'"

Cichocki v. Astrue, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting Mongeur, 722 F.2d at 1040).

Here, the ALJ properly weighed the opinion evidence and there is simply no indication he

weighed any opinions "without explanation" or "without detailing more."

Also, the ALJ could properly choose to accord significant weight to the opinions of Dr.

Rupp-Goolnick, a consulting physician. See Rosier v. Colvin, 586 F. App'x 756, 758 (2d Cir.

2014) (summary order) (consultative examiner's opinion constitutes substantial evidence

supporting ALJ's decision to accord little weight to treating source); Rivera v. Colvin, 2015 WL

1027163, at *16 (S.D.N.Y. Mar. 9, 2015) ("It is not per se legal error for an ALJ to give greater

weight to a consulting opinion than a treating opinion.") (citations omitted). Dr. Rupp-

Goolnick's conclusion that Pappas had no limitations as to performing simple tasks, maintaining a regular schedule, and relating adequately with others, R. 345, is supported by substantial evidence in the record.  R. 92-93, 345, 349, 351-53, 356-58.

We next address the 2014 and 2016 notes from Montefiore Medical Center, because Pappas appears to argue that those records purport to contain opinions from treating sources. See Pl. Mem. at 20 (referring to "treating source statements" in "2014 and 2016"); R. 250-55 (October 2014 report), 376-79 (September 2016 report).

Nurse practitioner (or "NP") Fitten, Pappas's treating nurse practitioner, on two occasions made assessments that Pappas had significant sit/stand/walk restrictions, some limitations on postural activities (especially as to balancing), and significant limitations as to working in conditions involving exposure to heights, operating mechanical parts, and other environmental factors.  R. 250-55, 376-79.  The ALJ determined that NP Fitten's opinions were "unsupported by objective clinical findings and [were] inconsistent with the evidence of record, as elaborated on in the decision," and accorded them little weight.  R. 46.

To start, for largely the same reasons as we have just explained, we find that the ALJ did not accord little weight to these opinions in a conclusory manner "without detailing more" as Pappas suggests.  Pl. Mem. at 20.  In fact, the ALJ thoroughly discussed the reasons why he believed NP Fitten's conclusions as to certain of Pappas's alleged physical limitations were unsupported by the record evidence.  R. 46-47.  For the reasons already given, we agree.  See R. 84, 203-04, 366-71, 383, 385-89, 391-94 (record evidence showing that Pappas's ability to engage in certain routine daily activities was not significantly limited by any physical impairments).  And the ALJ did not err in failing to accord NP Fitten's opinions controlling weight as a "treating source."  "Because they are not acceptable medical sources pursuant to

[SSA] Regulations, nurse practitioners cannot be considered treating sources subject to the treating physician rule." <u>Smith v. Comm'r of Soc. Sec.</u>, 337 F. Supp. 3d 216, 222 (W.D.N.Y. 2018) (citing <u>Taylor v. Colvin</u>, 2016 WL 1049000, at *5 (N.D.N.Y. Mar. 11, 2016)); <u>accord</u> <u>LaValley v. Colvin</u>, 672 F. App'x 129, 130 (2d Cir. 2017) (summary order) ("Only 'acceptable medical sources' may be considered 'treating sources.' [20 C.F.R.] § 404.1502.  A nurse practitioner is not an 'acceptable medical source.'  <u>Id.</u> § 404.1513(a), (d)."); <u>Puckett v. Berryhill</u>, 2018 WL 6625095, at *14 (S.D.N.Y. July 13, 2018) ("since nurse practitioners were not listed as 'acceptable medical sources,' they [cannot] give 'medical opinions,' and [an] ALJ . . . [is] not required to give [an NP]'s opinion any weight") (citing cases).[8]  In sum, there is substantial record evidence that the ALJ properly weighed NP Fitten's opinions.

We turn next to Pappas's arguments that the ALJ improperly weighed the opinions of Dr. Damari and Dr. Archbald, Pl. Mem. at 20, and that the ALJ erred in failing to articulate "good reasons" for weighing these opinions, <u>id.</u> at 19; <u>see</u> R. 46-47.  We have already discussed why the ALJ could properly weigh Dr. Damari's opinions as he did.  As for Dr. Archbald's opinions, the ALJ could properly conclude that Dr. Archbald's opinion that Pappas "should limit activities involving moderate exertion and that the claimant is able to sit for 4 hours during an 8-hour workday, stand for 2 hours during an 8-hour workday, walk for 2 hours during an 8-hour workday," R. 46, was inconsistent with the record as a whole because the record evidence showed Pappas's ability to engage in certain routine daily activities was not significantly limited by any physical impairments, and there was no evidence that Pappas would not be able to

---

[8]  "Recent revisions to the SSA regulations treat advanced practice registered nurses as 'acceptable medical sources', but 'only with respect to claims filed on or after March 27, 2017.'" <u>Rivas v. Berryhill</u>, 2018 WL 4666076, at *10 n.6 (S.D.N.Y. Sept. 27, 2018) (citing  20 C.F.R. § 404.1502(a)(7)) (additional citation omitted).  Because Pappas's claim was filed before that date, the new rule does not apply.

perform light work with certain restrictions.  See, e.g., R. 81-82, 84, 203-04, 242, 270, 277, 366-71, 383, 385-89, 391-95 (evidence suggesting that while Pappas has some limitations, he had mostly normal physical examinations indicating that he could return to work with the restriction that he be limited to work requiring only light exertion).

Pappas faults the ALJ for finding Dr. Damari's opinion to be "inconsistent" where Dr. Damari's findings, according to Pappas, "echo the school psychologist's findings, match Dr. Rupp-Goolnick's assessment of 'borderline' cognitive functioning and limited insight, and correspond to NP Fitten's findings."  Pl. Mem. at 19.  In fact, the ALJ found Dr. Damari's opinion to be "inconsistent" with the record as a whole, R. 46, and for the reasons already given, substantial evidence supports that conclusion.  Additionally, even if Dr. Damari's opinions were in some ways consistent with other evidence — for example, the school psychologist's opinions, or those of Dr. Rupp-Goolnick or NP Fitten — the ALJ may exercise discretion in weighing the opinions of a claimant's physicians, see, e.g., Cardoza v. Comm'r of Soc. Sec., 353 F. Supp. 3d 267, 278-79 (S.D.N.Y. 2019), and it is within the ALJ's discretion to resolve "[g]enuine conflicts in the medical evidence," Veino, 312 F.3d at 588; see also Camara v. Colvin, 2013 WL 5870059, at *5 (S.D.N.Y. Oct. 23, 2013) ("[E]ven if substantial evidence did support both viewpoints here, the Court must uphold the Commissioner's finding.  'Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.'") (quoting Alston, 904 F.2d at 126).

C.  Failure to Properly Weigh Opinion Evidence of Physical Limitations

Pappas also contends that the ALJ "erred by discounting the opinions of treating NP Fitten as unsupported by findings and inconsistent with the record without first seeking the underlying primary care records."  Pl. Mem. at 21.  We view this as an argument that (1) the ALJ

improperly assigned "little" weight to NP Fitten's two assessments from 2014 and 2016, and (2) the ALJ improperly rejected these opinion because the record was undeveloped by the ALJ. See id. Pappas also argues that the ALJ erred in giving "little" weight to the opinions of Dr. Archbald. Id. at 22.

NP Fitten's opined in 2016 that Pappas experienced back pain from standing, that he was limited to walking beyond two blocks without rest, and that he would only be able to sit/stand/walk for about two hours in an eight hour day. R. 376-78. NP Fitten also noted that Pappas took cardiac medication causing him to experience "rapid head movement" and to become dizzy and tired. R. 376. NP Fitten reported similar findings on her 2014 medical source statement. R. 250-55. The ALJ accorded the opinions "little" weight as they were "unsupported by objective clinical findings and [were] inconsistent with the evidence of record." R. 46.

In making his RFC determination that Pappas could perform "light work" with certain physical limitations, the ALJ considered Pappas's symptoms and the medical evidence as required by 20 C.F.R. § 404.1529 and SSR 96-4p, R. 38, as well as opinion evidence as required by 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p, R. 39. The ALJ followed the "two-step process" in which it is first "determined whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms." R 39. Then, if "an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown," the ALJ must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." R. 39. The ALJ then considered Pappas's symptoms and whether they resulted in a "medically determinable physical or mental impairment" and whether such an impairment

"could reasonably be expected to produce" Pappas's symptoms.

As for back pain, the ALJ found that there was "no evidence of excessive medical treatment for spinal pain," or "evidence of persistent musculoskeletal symptoms or clinical findings." R. 39. This determination was supported by substantial evidence because, as the ALJ noted, R. 39-40, evidence showed that Pappas's back pain was not a medically determinable physical impairment. See, e.g., R. 388 (March 2014 internal medicine examination noting "no limitations in the claimant's ability to sit, stand, climb, push, pull, or carry heavy objects"), 297 (July 2015 records from Montefiore Medical Center in which Pappas denied back pain). Other evidence supports the conclusion that Pappas's physical impairments regarding his back, shoulder, and heel pain were not so severe as to prohibit him from performing light work activities. See, e.g., R. 250-55 (treating NP Fitten's October 2014 medical source statement that Pappas could occasionally lift and carry up to 10 pounds, that he was not substantially limited in his ability to use his hands, climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, and that he could perform basic activities like travel independently, prepare simple meals, and perform activities like shopping), 366-71 (consultative examiner Dr. Archbald's 2016 evaluation that Pappas could frequently lift up to 10 pounds, had only "mild limitations for bending" and squatting, and had no restrictions on activities of daily living). These medical notes are supported in part by Pappas's own function report from May 2014, in which Pappas did not indicate that he was taking any medication for pain aside from Advil. R. 203-04.[9]

As to Pappas's cardiac impairment, consultative examiner Dr. Archbald evaluated Pappas

---

[9] In passing, Pappas states that the ALJ did not fully develop the record because the record contains "scant underlying records from Montefiore, where Mr. Pappas receives the bulk of his medical care." Pl. Mem. at 21. Pappas provides no evidence, however, that Montefiore failed to produce any records in its possession.

in April 2016 and concluded that, while Pappas's prognosis was fair, Pappas had "mild limitations for bending" and "should limit activities involving moderate exertion due to his cardiac history." R. 364. The ALJ considered these opinions and accorded them "little" weight because they were "unsupported by objective clinical findings and [were] inconsistent with the evidence of record." R. 46.

The ALJ considered Pappas's heart complications and acknowledged his cardiovascular disorder. R. 40. Nevertheless, the ALJ found that the "record does not contain evidence of persistent cardiovascular symptoms or clinical findings, which establish the existence of a cardiovascular disorder, which would preclude performance of light work." R. 40. This determination was supported by substantial evidence. See, e.g., R. 363 (April 2016 consultative examination noting that Pappas's heart had a "[r]egular rhythm"), 302 (July 2015 Montefiore records, which note that Pappas was "doing well" post-surgery), 382 (May 2016 visit notes from Montefiore finding, as to Pappas's cardiovascular health: "[r]egular rate and rhythm with no murmurs, rubs or gallops"). The ALJ found similarly as to Pappas's alleged disabling hypertension. R. 41-42; see R. 242 (June 2014 internal medical examine noting that Pappas's hypertension was stable), R. 84 (medical expert's October 2016 testimony that Pappas's hypertension was "under control"). Considering the above evidence, the ALJ could properly find that Pappas had the RFC to perform light work, "which does not require more than occasional stooping, bending, crouching and kneeling, which does not require more than occasional contact with supervisors, coworkers and the public, and which is simple task/instruction work." R. 38.

Pappas maintains that the ALJ failed to employ the "regulatory factors when assessing the weight for [the] medical opinion [of Dr. Archbald], which is error." Pl. Mem. at 22 (citing

Rodriguez v. Colvin, 2015 WL 1903146, at *25 (S.D.N.Y. Mar. 31, 2015)). While the ALJ may

not have explicitly discussed each factor contained in 20 C.F.R. § 416.927 in according the

opinions of Dr. Archbald little weight, that is not necessarily legal error. See Ortiz v. Comm'r of

Soc. Sec., 309 F. Supp. 3d 189, 204 (S.D.N.Y. 2018) ("[W]hile the ALJ did not apply each factor

in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) the ALJ was under no obligation to do so.")

(citing Atwater v. Astrue, 512 F. App'x. 67, 70 (2d Cir. 2013)). Here, the ALJ discussed the

supportability and consistency of Dr. Archbald's opinions, and accorded less weight to Dr.

Archbald's opinions in part due to Pappas's ability to engage in various activities of daily living

as already discussed above. See R. 46-47. Also, there was no indication that Pappas's cardiac

impairment would impair his ability to continue engaging in those daily activities. And even if

Dr. Archbald is correct that Pappas should "limit activities involving moderate exertion," Pappas

does not explain why this opinion would be in conflict with the ALJ's conclusion that Pappas is

limited to light work.[10] For these reasons, the ALJ did not err in according little weight to

certain opinions of NP Fitten and Dr. Archbald concerning Pappas's physical limitations.

    D.  Failure to Assess the Credibility of Pappas's Statements

    Pappas argues that the ALJ erred in assessing his statements about the severity of his

_____

   [10] Light work is defined as follows:

   Light work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds. Even though the weight lifted
may be very little, a job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls. To be considered capable of performing a full or
wide range of light work, you must have the ability to do substantially all of these
activities. If someone can do light work, we determine that he or she can also do
sedentary work, unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

symptoms "as both 'inconsistent with the RFC' and generically as 'unsupported' by the evidence." Pl. Mem. at 19 (citing R. 38, 48). For the following reasons, we find that the ALJ did not err in making his credibility determination.

Pappas claimed limitations were set forth in a function report completed by his mother. See R. 194-206. That report stated that Pappas has to be told to change his clothes, bathe, and shave. R. 195-96. He need reminders to take medicine. R. 196. He does not cook or prepare any meals but can heat up food in the microwave. R. 196. He is "afraid of knives, opening cans, etc." R. 196. He cannot do any yard or house work because of his scoliosis, shoulder pain, heel spurs, back pain, and mental impairments. R. 197. He cannot drive due to his mental impairments. R. 197-98. He has trouble lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, and reaching due to these impairments. R. 199-200. He has problems paying attention, gets distracted, and can only "sometimes" follow spoken and written instructions due to his mental impairments. R. 201. The pain from Pappas's physical impairments is brought on by "all activities." R. 203. Pappas states that he "can[']t do too much of anything" due to the pain. R. 204. At the end of his RFC analysis, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the overall record does not support the severity of the claimant's allegations. The claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not supported by the medical evidence and other evidence in the record for the reasons explained in this decision.

R. 48.

Pappas argues, Pl. Mem. at 19, that the ALJ's analysis did not comply with the SSA Rule 16-3p, which provides: "In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or

her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'"  However, the ALJ's analysis conformed to Rule 16-3p. In fact, the ALJ specifically noted that Pappas's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not supported by the medical evidence and other evidence in the record <u>for the reasons explained in this decision</u>."  R. 48 (emphasis added).  The ALJ  devoted several pages of analysis providing his reasoning for his statement concerning credibility, which includes the ALJ's discussion of the opinions of treating and non-treating sources, as well as Pappas's activities of daily living and hearing testimony.  R. 40, 43-44, 46; <u>see also</u> R. 45 (the ALJ noting that he "carefully considered the nature and intensity of any symptoms, any precipitating or aggravating factors, the effectiveness of treatment and the claimant's activities" under 20 C.F.R. § 404.1529 and SSR 16-3p).  Based on ALJ's detailed review of the record, we cannot agree that his analysis was "conclusory" in any way.

As previously noted, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints."  <u>Aponte</u>, 728 F.2d at 591 (internal citations omitted); <u>accord</u> <u>Them v. Colvin</u>, 2015 WL 10635499, at *13 (S.D.N.Y. Dec. 22, 2015); <u>Vargas v. Astrue</u>, 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011); <u>see also</u> 42 U.S.C. § 405(g).  Here, there is substantial evidence supporting the Commissioner's credibility determination.  While Pappas claimed that symptoms stemming from his physical and mental conditions — scoliosis, left shoulder pain, high blood pressure, and learning disabilities — limited his ability to work, <u>see</u>, <u>e.g.</u>, R. 188-90, the evidence shows that Pappas's ability to perform basic work activities was not significantly limited.  To start, Pappas in November 2014 reported during a psychological evaluation that he had worked for 26 years as an office messenger and conducted deliveries for his employer.

R. 256; accord R. 9, 72, 249, 261, 343.  He stated that he was laid off in March 2013, and that

although he had been looking "for a job, . . . he ha[d] not found anything that he has been

interested in and is undecided as to what he wants to do."  R. 256.  There is no suggestion that

Pappas's impairments had anything to do with him losing his job, and Pappas's statement that he

had not found anything that was "interested in" and he was "undecided as to what he wants to

do" support the notion that his claimed limitations were not credible.  Also, the ALJ discussed

thoroughly the wide range of activities Pappas actually performed in daily life.  These include:

grooming himself and maintaining good hygiene, cooking simple meals, using public

transportation, helping with cleaning around the house, doing "some" shopping, taking walks,

socializing with friends, going on the internet, watching television, playing video games, and

drawing.  R. 36-37, 46-47.  Pappas's ability to engage in these activities was confirmed by the

state agency specialist, consultative examiners, and one of Pappas's own treating sources.  R.

250-55 (treating nurse practitioner Joan Fitten's October 2014 medical source statement that

Pappas could occasionally lift and carry up to 10 pounds, that he was not substantially limited in

his ability to use his hands, climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, and

that he could engage in activities like traveling independently, preparing simple meals, and doing

some shopping), 391-94 (Dr. Damari's psychological examination from March 2014 noting

Pappas is "able to follow and understand simple directions and instructions and perform simple

tasks independently," that he can "maintain a regular schedule," and "appropriately deal with

stress" and "make appropriate decisions"), 385-89 (internist and consultative examination from

March 2014 noting Pappas had "no limitations in [his] ability to sit, stand, climb, push, pull, or

carry heavy objects"), 366-71 (consultative examiner Dr. Archbald's 2016 evaluation that

Pappas could frequently lift up to 10 pounds, had only "mild limitations for bending" and

squatting, and had no restrictions on activities of daily living). Also supporting the ALJ's

conclusion that Pappas's symptoms were not so limiting was Pappas's own function report, on

which Pappas did not indicate he was taking any medication for pain aside from Advil. R. 203-

04. As recent as 2016, post-heart surgery, Pappas's outpatient records indicate he was

prescribed medication for high blood pressure, high cholesterol, as well as aspirin, an anti-

bacterial cream, and a multivitamin. R. 383. There is no indication he was taking any

medication specifically for chronic pain or other physical impairments. In light of this evidence,

the ALJ did not err in making his credibility determination as to Pappas's symptoms.

Pappas maintains that "rejecting statements as inconsistent with the RFC inverts the logic

in the regulations," and "[a]n RFC must be based on the evidence of record, which includes a

claimant's statements." Pl. Mem. at 19. This argument is based on the incorrect assertion that

the ALJ found Pappas's symptoms to be "inconsistent with his RFC." See id. But this statement

appears nowhere in the ALJ's decision. Nor does the ALJ even suggest that he rejected any

statements of Pappas simply because they were inconsistent with the RFC. Thus, the case cited

by Pappas, Emerson v. Comm'r of Soc. Sec., 2014 WL 1265918 (S.D.N.Y. Mar. 27, 2014), is

irrelevant.

Indeed, the ALJ here considered Pappas's claimed symptoms in making an RFC

determination, and did not "disregard" the symptoms merely because they were not substantiated

by objective medical evidence or in line with the RFC. For instance, the ALJ noted that

although Pappas complained of an "alleged disability due to scoliosis and has complained of

back pain," the ALJ found that allegation to be less credible because there was "no evidence of

extensive medical treatment for spinal pain," no "X-ray examination, CT scan examination or

Magnetic Resonance Imaging results pertaining to the spine," and the record did "not contain

evidence of persistent musculoskeletal symptoms or clinical findings, which establish the existence of a spinal disorder, which would preclude performance of light work." R. 39. As another example, the ALJ explained that while Pappas had an "alleged disability due to mental retardation and a learning disability," the "evidence of record[] . . . does not establish the existence of [such a mental] impairment, which would preclude performance of simple task/instruction work, which does not require more than occasional contact with supervisors, coworkers or the public and that the claimant has a 20(+) year work history . . . as an indoor messenger." R. 43. That evidence was reviewed at length. R. 39-47. The ALJ thus considered Pappas's symptoms in making his RFC determination.

We note also that an ALJ "is not required to explicitly address each and every statement made in the record that might implicate his evaluation of the claimant's credibility as long as 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision.'" Colbert, 313 F. Supp. 3d at 580 (quoting Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order), and Mongeur, 722 F.2d at 1040). Here, the ALJ engaged in an extensive evaluation of the record, giving a detailed explanation of how he came to determine Pappas's actual limitations and the reasons they were at odds with the limitations claimed by Pappas.

E. Failure to Postpone the October Hearing

The first administrative hearing, at which Pappas appeared pro se, took place in the Bronx, New York, and lasted 30 minutes. R. 58. The hearing consisted mainly of the ALJ explaining to Pappas that he had the right to have an attorney present, and that free legal services existed if he wished to explore that option. R. 59-60. Pappas explained — with the help of his aunt — that he previously had an attorney but that the attorney had "pulled out" the week before the hearing was to take place. R. 61. In light of this, the ALJ asked Pappas whether he wished

to continue with the hearing, or if he would like the ALJ to adjourn the hearing so that Pappas could have additional time to retain counsel.  R. 60-63.  After taking a few minutes to discuss the matter with his aunt, Pappas asked the ALJ to adjourn the hearing, and the ALJ did so.  R. 63.  The ALJ specifically informed Pappas: "The next time you come back you go ahead whether or not you have an attorney with you."  R. 59.

The second hearing took place on October 13, 2016, in the Bronx, New York, and consisted of testimony from Pappas, and testimony via telephone from Dr. Kunstadt, and VE Feldman.  R. 68.  The hearing began with a discussion regarding the fact that Pappas was again appearing without counsel.  R. 69.  In response to the ALJ asking whether he wanted an opportunity to "look at the exhibits" pertinent to his case, Pappas responded: "Not really. . . . Just I mean postpone them until we get a lawyer?"  R. 69.  Pappas's aunt, who was observing, explained that Pappas's alleged legal services "didn't have a lawyer available" for the hearing.  R. 69.  The ALJ stated that he could not postpone the hearing because the hearing was already a "supplementary" hearing (presumably referring to the fact that it had been adjourned from the previous February).  R. 69.  The ALJ stated that the hearing could not be postponed again, noting that "we have two experts here, we pay for them and also every time you get a postponement somebody else's hearing is delayed."  R. 69-70.  The ALJ stated that if Pappas had wanted a lawyer, "he could have brought one in with him," and that "i[f] [Pappas] had asked for a postponement a week ago I might have granted it."  R. 69.  The hearing then went forward.

Pappas now argues he had a statutory right to be represented, and because he wished to be represented, his right was violated by the ALJ's decision to continue with the hearing anyway.  Pl. Mem. at 22-27.

As stated by the Second Circuit:

The applicable statute and regulations state that, when notifying a claimant of an adverse determination, the Commissioner of Social Security (or his agent for these purposes) must "notify [the] claimant in writing" of (1) her "options for obtaining [an] attorney[ ] to represent [him or her]" at her hearing, and (2) "the availability . . . of . . . organizations which provide legal services free of charge" to "qualifying claimants." 42 U.S.C. §§ 406(c), 1383(d)(2)(D); see also 20 C.F.R. § 404.1706. Moreover, at the hearing itself, "the ALJ must ensure that the claimant is aware of [his or her] right [to counsel]." Robinson v. Sec'y of Health & Human Servs., 733 F.2d 255, 257 (2d Cir. 1984).

Lamay v. Commr. of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009). Additionally, while an ALJ is

"free to grant an adjournment sua sponte or upon a showing of 'good cause,'" Spears v. Heckler,

625 F. Supp. 208, 218 (S.D.N.Y. 1985) (citing 20 C.F.R. § 404.936); see 20 C.F.R.

§ 416.1436(f), "[n]either the Act nor SSA regulations require[] and ALJ to adjourn [a] hearing

date at [a] plaintiff's request," Spears, 625 F. Supp. at 218 (citing 42 U.S.C. § 405(b) and 20

C.F.R. § 404.936). "In determining whether good cause exists," an ALJ must consider any

"reason(s) for requesting the change, the facts supporting it, and the impact of the proposed

change on the efficient administration of the hearing process." 20 C.F.R. § 416.1436(f)(2).

Here, Pappas does not contend that the ALJ failed to inform him of his right to

representation as required by Lamay. Indeed, the record reflects that he was so informed

multiple times in writing, R. 98, 102-05, 109-10, 114-16, 119-20, 130-31, 134, 136-37, and

orally at the first hearing, R. 59-63. He was also informed of the availability of organizations

providing free legal services for social security claimants. R. 59, 98, 114, 119, 131, 136.

Instead, Pappas appears to argue that because he did not agree to proceed with the second

hearing without a representative, his right to have a representative present was violated. We

disagree. First, the ALJ gave Pappas more than six months to obtain representation. The ALJ

also explained to Pappas that he would have to go forward at the next hearing date "whether or

not you have an attorney with you." R. 59. Thus, Pappas was on notice that if he appeared at

the re-scheduled hearing without representation, the hearing would proceed. Nothing in the governing statute or regulations required the ALJ to grant a second adjournment. Moreover, case law fully supports the ALJ's actions. See Marino v. Comm'r of Soc. Sec., 2016 WL 482070, at *3 (N.D.N.Y. Feb. 5, 2016) (claimant deemed to have waived right to counsel after the ALJ granted a three-month adjournment so claimant could obtain representation and claimant appeared at the subsequent hearing without counsel); Gonzalez v. Barnhart, 2003 WL 22383376, at *4 (S.D.N.Y. Oct. 16, 2003) (claimant deemed to have waived right to counsel after the ALJ granted a two-month adjournment and claimant failed to obtain representation); see also Melton v. Colvin, 2014 WL 1686827, at *8 (W.D.N.Y. Apr. 29, 2014) ("ALJ reasonably denied Plaintiff's request to post-pone the hearing" where plaintiff, via counsel, had a "three month time frame" in which "to initially prepare the case").

None of the cases cited by Pappas suggest that the ALJ committed error. In Taveras v. Apfel, 1998 WL 557587 (S.D.N.Y. Sept. 2, 1998), the court found that the claimant had not waived his right to representation at his initial hearing because he "stated that he did indeed want representation at least twice during the exchange," and "[d]espite the presence of an interpreter, it [was] also clear that the plaintiff had difficulty understanding the proceedings and the role of counsel." Id. at *3. In Spears v. Heckler, 625 F. Supp. 208 (S.D.N.Y. 1985), the court declined to reach the issue of whether the claimant had shown "good cause" to adjourn the hearing and rested its decision on the fact that the Court improperly found that the claimant had voluntarily chosen to proceed without counsel. Id. at 218. In some cases cited by Pappas, the claimant was not properly informed of his or her right to have counsel present at the hearing. See Sheerinzada v. Colvin, 4 F. Supp. 3d 481, 495 (E.D.N.Y. 2014); Hynes v. Astrue, 2013 WL 3244825, at *4, *13 (E.D.N.Y. June 26, 2013); Rose v. Barnhart, 2003 WL 1212866, at *4 (S.D.N.Y. Mar. 14,

42

2003); <u>Santana v. Apfel</u>, 44 F. Supp. 2d 482, 484 (E.D.N.Y. 1999). Such facts are simply not present here and thus these cases are irrelevant.

Pappas also cites to <u>Acevedo v. Colvin</u>, 2016 WL 1618260 (D. Conn. Feb. 29, 2016), <u>adopted</u>, 2016 WL 1588488 (D. Conn. Apr. 20, 2016), which involved a claimant who required a Spanish language interpreter. The claimant attended an initial hearing in December 2012, which was postponed for the plaintiff to obtain representation. <u>Id.</u> at *1-3. At the subsequent hearing, the claimant again appeared without counsel and the ALJ elected to proceed. <u>Id.</u> at *2. However, there was no indication that the claimant had been warned at the first hearing that there would be only one adjournment for the purpose of obtaining counsel. Furthermore, the court noted that the notices regarding to right to representation had been provided "only in English." <u>Id.</u> at *4. For those reasons and because the claimant had "severe mental impairments," the court was "unable to confidently say that Plaintiff understood and knowingly waived her right to representation." <u>Id.</u> Here, Pappas suffered from no language deficit, there is no argument the notices and warnings Pappas received were inadequate, there is no evidence that Pappas had any "severe" mental impairments that would leave him unable to understand the ALJ or his rights, and Pappas was warned that he would receive only one adjournment. Thus, <u>Acevedo</u> does not suggest the ALJ erred.

IV. <u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 11) is granted and the plaintiff's cross-motion for judgment on the pleadings (Docket # 23) is denied. The Clerk is requested to enter judgment.

SO ORDERED.

Dated: New York, New York
November 6, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge

44